**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

**THOMAS WEST JR.**, on behalf of himself and all others similarly situated,

Plaintiff,

v.

**CLEO COMMUNICATIONS, INC.** and **WK KELLOGG CO.**,

Defendants.

Case No. 3:25-cv-50177

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

Thomas West Jr. ("Plaintiff"), through his attorneys, individually and on behalf of all others similarly situated, brings this Class Action Complaint against Cleo Communications, Inc. ("Cleo" or Defendant") and WK Kellogg Co. ("WK Kellogg" or "Defendant") (together "Defendants"), and their present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiff alleges the following on information and belief—except as to his own actions, counsel's investigations, and facts of public record.

## NATURE OF ACTION

1. This class action arises from Defendants' failure to protect highly sensitive data.

2. Cleo is a developer of managed file transfer platforms and thus collects information from current and former clients (including WK Kellogg).

3. WK Kellogg is a food manufacturer—primarily of cereal products including "Frosted Flakes" and "Froot Loops."[1]

[1] *Our Brands*, WK KELLOGG CO, https://www.wkkellogg.com/our-foods/our-brands (last visited April 15, 2025).

4. As such, WK Kellogg stores a litany of highly sensitive personal identifiable information ("PII") about its current and former employees. But WK Kellogg lost control over that data when cybercriminals infiltrated its insufficiently protected computer systems in a data breach (the "Data Breach").

5. It is unknown for precisely how long the cybercriminals had access to Defendants' network before the breach was discovered. In other words, Defendants had no effective means to prevent, detect, stop, or mitigate breaches of their systems—thereby allowing cybercriminals unrestricted access to WK Kellogg's current and former employees' PII.

6. On information and belief, cybercriminals were able to breach Defendants' systems because Defendants failed to adequately train their employees on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect the Class's PII. In short, Defendants' failures placed the Class's PII in a vulnerable position—rendering them easy targets for cybercriminals.

7. Plaintiff is a Data Breach victim, having received a breach notice—attached as Exhibit A. He brings this class action on behalf of himself, and all others harmed by Defendants' misconduct.

8. The exposure of one's PII to cybercriminals is a bell that cannot be unrung. Before this data breach, WK Kellogg's current and former employees' private information was exactly that—private. Not anymore. Now, their private information is forever exposed and unsecure.

## PARTIES

9. Plaintiff, Thomas West Jr., is a natural person and citizen of Bellevue, Michigan where he intends to remain.

10. Defendant, WK Kellogg Co., is a profit corporation incorporated in Delaware and with its principal place of business at One Kellogg Square, Battle Creek, Michigan 49017.

11. Defendant, Cleo Communications, Inc., is an Illinois corporation with a principal place of business located at 4949 Harrison Avenue, Suite #200, Rockford, Illinois 61108.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Members of the proposed Class are citizens of different states than Defendants. For example, in its official disclosures, WK Kellogg revealed that there are at least ten (10) class members in Massachusetts.[2] And there are over 100 putative Class Members.

13. This Court has personal jurisdiction because Cleo is headquartered in Illinois, regularly conducts business in Illinois, and has sufficient minimum contacts in Illinois.

14. Venue is proper in this Court because Cleo's principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## BACKGROUND

***Defendants Collected and Stored the PII of Plaintiff and the Class***

15. WK Kellogg is a food manufacturer—primarily of cereal products including "Frosted Flakes" and "Froot Loops."[3]

---

[2]. *See Data Breach Notification Report*, MASS ATTY GEN, https://www.mass.gov/doc/data-breach-report-2025/download (last visited April 15, 2025).

[3] *Our Brands*, WK KELLOGG CO, https://www.wkkellogg.com/our-foods/our-brands (last visited April 15, 2025).

16. As part of its business, WK Kellogg receives and maintains the PII of thousands of its current and former employees.

17. In collecting and maintaining the PII, WK Kellogg agreed it would safeguard the data in accordance with its internal policies, state law, and federal law. After all, Plaintiff and Class Members themselves took reasonable steps to secure their PII.

18. Under state and federal law, businesses like WK Kellogg have duties to protect its current and former employees' PII and to notify them about breaches.

19. WK Kellogg recognizes these duties, declaring in its "WK Kellogg Co Applicant Privacy Notice" that:

a. "This Job Applicant Privacy Notice ('Notice') applies to the Personal Information that WK Kellogg Co and our subsidiaries and affiliates located worldwide (collectively 'Company', 'WKKC', 'we', 'our', or 'us') collect about individuals in our job application process, including our careers websites (and ) ('Applicants')."[4]

b. "We strive to maintain appropriate administrative, technical, and physical safeguards that are designed to help protect Personal Information collected or received through our websites."[5]

c. "We implement security measures to protect your Personal Information, such as Captchas and Multi-Factor Authentication."[6]

20. Similarly, in its "WK Kellogg Co Privacy Notice, WK Kellogg promises that:

[4] *WK Kellogg Co Applicant Privacy Notice*, WK KELLOGG CO (August 28, 2023) https://www.wkkellogg.com/applicant-privacy-notice.
[5] *Id.*
[6] *Id.*

a. "We strive to maintain appropriate administrative, technical, and physical safeguards that are designed to help protect personal information collected or received through the Sites."[7]

b. "We may collect, use, and disclose your personal information as required or permitted by applicable law."[8]

c. "We will store your personal information for no longer than is necessary for the performance of our obligations or to achieve the purposes for which the information was collected, or as may be required or permitted under applicable law. To determine the appropriate retention period, we will consider the amount, nature, and sensitivity of the data; the potential risk of harm from unauthorized use or disclosure of the data; the purposes for which we process the data and whether we can achieve those purposes through other means; and the applicable legal requirements."[9]

***The Data Breach***

21. On December 7, 2024, Cleo was hacked in the Data Breach.[10]

22. Worryingly, WK Kellogg already admitted that following:

---

[7] *WK Kellogg Co Privacy Notice*, WK KELLOGG CO (August 28, 2023) https://www.wkkellogg.com/privacy-notice

[8] *Id.*

[9] *Id.*

[10] *Data Breach Notification*, MAINE ATTY GEN (April 4, 2025) https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/9b6116f8-043e-40c5-a210-c152d4edfa95.html.

a. "WK Kellogg Co. ('WK Kellogg'), learned on February 27, 2025 that a vendor it uses for secure file transfers, Cleo, experienced a security incident."[11]

b. "In response, WK Kellogg immediately began to investigate, contacted Cleo, and Cleo informed WK Kellogg that an unauthorized person gained access on December 7, 2024 to the servers Cleo hosted that were used for transferring employee files to WK Kellogg human resources service vendors."[12]

23. Because of WK Kellogg's Data Breach, at least the following types of PII were compromised: names and Social Security numbers.

24. Currently, the precise number of persons injured is unclear. But upon information and belief, the size of the putative class can be ascertained from information in WK Kellogg's custody and control. And upon information and belief, the putative class is over one hundred members—as it includes its current and former employees.

25. And yet, WK Kellogg waited over until April 4, 2025, before it began notifying the class—a full 118 days after the Data Breach occurred.[13]

26. Thus, WK Kellogg kept the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

27. And when WK Kellogg did notify Plaintiff and the Class of the Data Breach, WK Kellogg acknowledged that the Data Breach created a present, continuing, and significant risk of suffering identity theft, warning Plaintiff and the Class:

---

[11] *Id.*
[12] *Id.*
[13] *Id.*

a. "[B]e vigilant for incidents of fraud or identity theft by reviewing your account statements and free credit reports for any unauthorized activity over the next 12 months."[14]

b. "[O]btain a copy of your credit report, free of charge, once every 12 months from each of the three nationwide credit reporting companies."[15]

28. Defendants failed their duties when their inadequate security practices caused the Data Breach. In other words, Defendants' negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the PII. And thus, Defendants caused widespread injury and monetary damages.

29. Since the breach, WK Kellogg claims that it "has worked with Cleo to identify the measures it has taken to address this incident."[16]

30. But such simple declarations are insufficient to ensure that Plaintiff's and Class Members' PII will be protected from additional exposure in a subsequent data breach.

31. Further, the Notice of Data Breach shows that WK Kellogg cannot—or will not—determine the full scope of the Data Breach, as WK Kellogg has been unable to determine precisely what information was stolen and when.

32. Defendants have done little to remedy their Data Breach. True, WK Kellogg has offered some victims credit monitoring and identity related services. But upon information and belief, such services are wholly insufficient to compensate Plaintiff and Class Members for the injuries that WK Kellogg inflicted upon them.

---

[14] *Id.*
[15] *Id.*
[16] *Id.*

33. Because of Defendants' Data Breach, the sensitive PII of Plaintiff and Class Members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiff and Class Members.

***CL0P & the Dark Web***

34. Worryingly, the cybercriminals that obtained Plaintiff's and Class Members' PII were the notorious cybercriminal group "CL0P."[17]

35. CL0P is an especially notorious cybercriminal group. In fact, the Federal Bureau of Investigation (FBI) and the Cybersecurity and Infrastructure Security Agency (CISA) released a joint report warning the public about CL0P.[18] Specifically, the joint "Cybersecurity Advisory" (CSA) stated, *inter alia*, that:

a. "Appearing in February 2019, and evolving from the CryptoMix ransomware variant, CL0P was leveraged as a Ransomware as a Service (RaaS) in large-scale spear-phishing campaigns that used a verified and digitally signed binary to bypass system defenses."[19]

b. "CL0P was previously known for its use of the 'double extortion' tactic of stealing and encrypting victim data, refusing to restore victim access and publishing exfiltrated data on Tor via the CL0P^_-LEAKS website."[20]

c. "In recent campaigns beginning 2021, CL0P preferred to rely mostly on data exfiltration over encryption."[21]

---

[17] Dan Raywood, *Third Party Breach Impacts WK Kellogg*, SC MEDIA UK (April 8, 2025) https://insight.scmagazineuk.com/third-party-breach-impacts-wk-kellogg.
[18] *#StopRansomware: CL0P Ransomware Gang*, FBI & CISA (June 7, 2023) https://www.cisa.gov/news-events/cybersecurity-advisories/aa23-158a.
[19] *Id.*
[20] *Id.*
[21] *Id.*

d. "The ransom notes threatened to publish the stolen files on the CL0P data leak site if victims did not pay the ransom amount."[22]

36. Here, third-party reports have confirmed the following:

a. "Cl0p, a prolific ransomware gang, have claimed the attack on WK Kellogg and ***have published data on its leak site***."[23]

b. "[T]he Clop ransomware gang listed WK Kellogg on their data leak extortion site."[24]

c. "[W]e discovered that Cl0p, a prolific ransomware gang, were responsible for the attack on WK Kellogg."[25]

37. Indeed, a screenshot of CL0P's Dark Web website confirms that the "FULL FILES" are available for other cybercriminals to "DOWNLOAD."[26]

---

[22] *Id.*

[23] Dan Raywood, *Third Party Breach Impacts WK Kellogg*, SC MEDIA UK (April 8, 2025) https://insight.scmagazineuk.com/third-party-breach-impacts-wk-kellogg (emphasis added).

[24] Bills Toulas, *Food giant WK Kellogg discloses data breach linked to Clop ransomware*, BLEEPING COMPUTER (April 7, 2025, 11:56 AM) https://www.bleepingcomputer.com/news/security/food-giant-wk-kellogg-discloses-data-breach-linked-to-clop-ransomware/.

[25] Niamh Ancell, *Kellogg discloses data breach, but it's not super cereal*, CYBERNEWS (April 15, 2025) https://cybernews.com/security/wk-kellogg-discloses-data-breach/.

[26] *Id.*


**Headquarters:**

1 Kellogg Sq, Battle Creek, Michigan, 49016, United States

**Phone:**

(269) 401-3000

**Website:**

www.wkkellogg.com

**Revenue:**

$2.7 Billion

**Industry:**

Food, Beverages & Tobacco, Manufacturing

**Warning:**

The company doesn't care about its customers, it ignored their security!!!

**FULL FILES**

DOWNLOAD1

38. Thus, on information and belief, Plaintiff's and the Class's stolen PII has already been published—or will be published imminently—by cybercriminals (likely CL0P) on the Dark Web.

***Plaintiff's Experiences and Injuries***

39. Plaintiff Thomas West Jr. is an employee of WK Kellogg.

40. Thus, WK Kellogg obtained and maintained Plaintiff's PII.

41. As a result, Plaintiff was injured by the Data Breach.

42. Plaintiff is very careful about the privacy and security of his PII. He does not knowingly transmit his PII over the internet in an unsafe manner. He is careful to store any documents containing his PII in a secure location.

43. As a condition of his employment with WK Kellogg, Plaintiff provided WK Kellogg with his PII. WK Kellogg used that PII to facilitate its employment of Plaintiff, including payroll, and required Plaintiff to provide that PII in order to obtain employment and payment for that employment.

44. Plaintiff provided his PII to WK Kellogg and trusted the company would use reasonable measures to protect it according to WK Kellogg's internal policies, as well as state and federal law. WK Kellogg obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

45. On information and belief, WK Kellogg provided Cleo with Plaintiff's PII. Plaintiff would not have provided his PII to WK Kellogg if he had known it would be shared with Cleo under inadequate cybersecurity.

46. Plaintiff reasonably understood that a portion of the funds derived from his employment would be used to pay for adequate cybersecurity and protection of PII.

47. Plaintiff does not recall ever learning that his information was compromised in a data breach incident—other than the breach at issue here.

48. Plaintiff received a Notice of Data Breach on April 14, 2025.

49. Thus, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

50. Through their Data Breach, Defendants compromised at least Plaintiff's name and Social Security number. But on information and belief, Plaintiff believes that the Data Breach

exposed a far broader range of PII including his date of birth, email addresses, and last three physical addresses.

51. Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft. After all, WK Kellogg directed Plaintiff to take those steps in its breach notice.

52. And in the aftermath of the Data Breach, Plaintiff has suffered from a spike in spam and scam emails, text messages, and/or phone calls.

53. Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

54. Plaintiff ***already suffered*** from the misuse of his PII. Indeed, in the fallout of the Data Breach, Plaintiff received a warning from his "CreditWise" identity monitoring service—which is provided by Capital One—that his name, date of birth, Social Security number, last three physical addresses, and email address were all found published on the Dark Web.

55. Because of the Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

56. Plaintiff suffered actual injury from the exposure and theft of his PII—which violates his rights to privacy.

57. Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that WK Kellogg was required to adequately protect.

58. Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because the Data Breach placed Plaintiff's PII right in the hands of criminals.

59. Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate his injuries.

60. Today, Plaintiff has a continuing interest in ensuring that his PII—which, upon information and belief, remains backed up in Defendants' possession—is protected and safeguarded from additional breaches.

***Consumers Prioritize Data Security***

61. In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[27] Therein, Cisco reported the following:

a. "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't trust with their data."[28]

b. "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[29]

---

[27] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer-privacy-report-2024.pdf (last visited March 19, 2025).
[28] *Id*. at 3.
[29] *Id*.

c. 89% of consumers stated that "I care about data privacy."[30]

d. 83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[31]

e. 51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[32]

f. 75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[33]

***Plaintiff and the Proposed Class Face Significant Risk of Continued Identity Theft***

62. Because of Defendants' failure to prevent the Data Breach, Plaintiff and Class Members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

a. loss of the opportunity to control how their PII is used;

b. diminution in value of their PII;

c. compromise and continuing publication of their PII;

d. out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

e. lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identify theft and fraud;

[30] *Id*. at 9.
[31] *Id*.
[32] *Id*.
[33] *Id*. at 11.

f. delay in receipt of tax refund monies;

g. unauthorized use of their stolen PII; and

h. continued risk to their PII—which remains in Defendants' possession—and is thus as risk for futures breaches so long as Defendants fails to take appropriate measures to protect the PII.

63. Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.

64. The value of Plaintiff and Class's PII on the black market is considerable. Stolen PII trades on the black market for years. And criminals frequently post and sell stolen information openly and directly on the "Dark Web"—further exposing the information.

65. It can take victims years to discover such identity theft and fraud. This gives criminals plenty of time to sell the PII far and wide.

66. One way that criminals profit from stolen PII is by creating comprehensive dossiers on individuals called "Fullz" packages. These dossiers are both shockingly accurate and comprehensive. Criminals create them by cross-referencing and combining two sources of data—first the stolen PII, and second, unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

67. The development of "Fullz" packages means that the PII exposed in the Data Breach can easily be linked to data of Plaintiff and the Class that is available on the internet.

68. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators

and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff and other Class Members' stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

69. Defendants disclosed the PII of Plaintiff and Class Members for criminals to use in the conduct of criminal activity. Specifically, Defendants opened up, disclosed, and exposed the PII of Plaintiff and Class Members to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen PII.

70. Defendants' failure to promptly and properly notify Plaintiff and Class Members of the Data Breach exacerbated Plaintiff and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

***Defendants Knew—Or Should Have Known—of the Risk of a Data Breach***

71. Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

72. In 2021, a record 1,862 data breaches occurred, exposing approximately 293,927,708 sensitive records—a 68% increase from 2020.[34]

73. Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware

[34] *See 2021 Data Breach Annual Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2022) https://notified.idtheftcenter.org/s/.

of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[35]

74. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendants' industry, including Defendants.

***Defendants Failed to Follow FTC Guidelines***

75. According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making. Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendants—should use to protect against unlawful data exposure.

76. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[36] The FTC declared that, *inter alia*, businesses must:

a. protect the personal customer information that they keep;

b. properly dispose of personal information that is no longer needed;

c. encrypt information stored on computer networks;

d. understand their network's vulnerabilities; and

e. implement policies to correct security problems.

---

[35] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

[36] *Protecting Personal Information: A Guide for Business,* FED TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

77. The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

78. Furthermore, the FTC explains that companies must:

a. not maintain information longer than is needed to authorize a transaction;

b. limit access to sensitive data;

c. require complex passwords to be used on networks;

d. use industry-tested methods for security;

e. monitor for suspicious activity on the network; and

f. verify that third-party service providers use reasonable security measures.

79. The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

80. In short, Defendants' failure to use reasonable and appropriate measures to protect against unauthorized access to its current and former employees' data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendants Failed to Follow Industry Standards***

81. Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendants. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-

malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

82. Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

83. Upon information and belief, Defendants failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

84. These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendants opened the door to the criminals—thereby causing the Data Breach.

## CLASS ACTION ALLEGATIONS

85. Plaintiff brings this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class:

> All individuals residing in the United States whose PII was compromised in the Data Breach discovered by WK Kellogg in February 2025, including all those individuals who received notice of the breach.

86. Excluded from the Class are Defendants, their agents, affiliates, parents, subsidiaries, any entity in which any Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

87. Plaintiff reserves the right to amend the class definition.

88. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on class-wide bases using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

89. Ascertainability. All members of the proposed Class are readily ascertainable from information in Defendants' custody and control. After all, Defendants already identified some individuals and sent them data breach notices.

90. Numerosity. The Class Members are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the proposed Class includes at least 100 members.

91. Typicality. Plaintiff's claims are typical of Class Members' claims as each arises from the same Data Breach, the same alleged violations by Defendants, and the same unreasonable manner of notifying individuals about the Data Breach.

92. Adequacy. Plaintiff will fairly and adequately protect the proposed Class's common interests. His interests do not conflict with Class Members' interests. And Plaintiff has retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

93. Commonality and Predominance. Plaintiff's and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting

individual Class Members—for which a class wide proceeding can answer for all Class Members. In fact, a class wide proceeding is necessary to answer the following questions:

a. if Defendants had a duty to use reasonable care in safeguarding Plaintiff's and the Class's PII;

b. if Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. if Defendants were negligent in maintaining, protecting, and securing PII;

d. if Defendants breached contract promises to safeguard Plaintiff and the Class's PII;

e. if Defendants took reasonable measures to determine the extent of the Data Breach after discovering it;

f. if Defendants' Breach Notice was reasonable;

g. if the Data Breach caused Plaintiff and the Class injuries;

h. what the proper damages measure is; and

i. if Plaintiff and the Class are entitled to damages, treble damages, and or injunctive relief.

94. Superiority. A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that individual litigation against Defendants would require. Thus, it would be practically impossible for Class Members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties

and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

## FIRST CAUSE OF ACTION
**Negligence**
**(On Behalf of Plaintiff and the Class)**

95. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

96. Plaintiff and the Class (or their third-party agents) entrusted their PII to Defendants on the premise and with the understanding that Defendants would safeguard their PII, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

97. Defendants owed a duty of care to Plaintiff and Class Members because it was foreseeable that Defendants' failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII in a data breach. And here, that foreseeable danger came to pass.

98. Defendants has full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if their PII was wrongfully disclosed.

99. Defendants owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendants knew or should have known would suffer injury-in-fact from Defendants' inadequate security practices. After all, Defendants actively sought and obtained Plaintiff and Class Members' PII.

100. Defendants owed—to Plaintiff and Class Members—at least the following duties to:

a. exercise reasonable care in handling and using the PII in its care and custody;

b. implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

c. promptly detect attempts at unauthorized access;

d. notify Plaintiff and Class Members within a reasonable timeframe of any breach to the security of their PII.

101. Thus, Defendants owed a duty to timely and accurately disclose to Plaintiff and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiff and Class Members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

102. Defendants also had a duty to exercise appropriate clearinghouse practices to remove PII it was no longer required to retain under applicable regulations.

103. Defendants knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiff and the Class involved an unreasonable risk of harm to Plaintiff and the Class, even if the harm occurred through the criminal acts of a third party.

104. Defendants' duty to use reasonable security measures arose because of the special relationship that existed between Defendants and Plaintiff and the Class. That special relationship arose because Plaintiff and the Class (or their third-party agents) entrusted Defendants with their confidential PII, a necessary part of obtaining services from Defendant.

105. Under the FTC Act, 15 U.S.C. § 45, Defendants had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiff and Class Members' PII.

106. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendants' duty to protect Plaintiff and the Class Members' sensitive PII.

107. Defendants violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein. Defendants' conduct was particularly unreasonable given the nature and amount of PII Defendants had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

108. The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendants hold vast amounts of PII, it was inevitable that unauthorized individuals would attempt to access Defendants' databases containing the PII — whether by malware or otherwise.

109. PII is highly valuable, and Defendants knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiff and Class Members' and the importance of exercising reasonable care in handling it.

110. Defendants improperly and inadequately safeguarded the PII of Plaintiff and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

111. Defendants breached these duties as evidenced by the Data Breach.

112. Defendants acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and Class Members' PII by:

a. disclosing and providing access to this information to third parties and

b. failing to properly supervise both the way the PII was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

113. Defendants breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII of Plaintiff and Class Members which actually and proximately caused the Data Breach and Plaintiff and Class Members' injury.

114. Defendants further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff and Class Members' injuries-in-fact.

115. Defendants has admitted that the PII of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

116. As a direct and traceable result of Defendants' negligence and/or negligent supervision, Plaintiff and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

117. And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

118. Defendants' breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendants' negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

**SECOND CAUSE OF ACTION**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

119. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

120. Plaintiff and Class Members were required to provide their PII to Defendants as a condition of receiving employment provided by Defendants. Plaintiff and Class Members provided their PII to Defendants or their third-party agents in exchange for Defendants' employment.

121. Plaintiff and Class Members reasonably understood that a portion of the funds derived from their labor would be used to pay for adequate cybersecurity measures.

122. Plaintiff and Class Members reasonably understood that Defendants would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendants' duties under state and federal law and their internal policies.

123. Plaintiff and the Class (or their third-party agents) accepted Defendants' offers by disclosing their PII to Defendants or their third-party agents in exchange for employment.

124. In turn, and through internal policies, Defendants agreed to protect and not disclose the PII to unauthorized persons.

125. In their Privacy Policy, Defendants represented that they had a legal duty to protect Plaintiff's and Class Member's PII.

126. Implicit in the parties' agreement was that Defendants would provide Plaintiff and Class Members with prompt and adequate notice of all unauthorized access and/or theft of their PII.

127. After all, Plaintiff and Class Members would not have entrusted their PII to Defendants in the absence of such an agreement with Defendants.

128. Plaintiff and the Class (or their third-party agents) fully performed their obligations under the implied contracts with Defendants.

129. The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

130. Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

131. Defendants materially breached the contracts it entered with Plaintiff and Class Members by:

a. failing to safeguard their information;

b. failing to notify them promptly of the intrusion into their computer systems that compromised such information.

c. failing to comply with industry standards;

d. failing to comply with the legal obligations necessarily incorporated into the agreements; and

e. failing to ensure the confidentiality and integrity of the electronic PII that Defendants created, received, maintained, and transmitted.

132. In these and other ways, Defendants violated their duty of good faith and fair dealing.

133. Defendants' material breaches were the direct and proximate cause of Plaintiff's and Class Members' injuries (as detailed *supra*).

134. And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

135. Plaintiff and Class Members performed as required under the relevant agreements, or such performance was waived by Defendants' conduct.

**THIRD CAUSE OF ACTION**
**Invasion of Privacy**
**(On Behalf of Plaintiff and the Class)**

136. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

137. Plaintiff and the Class (or their third-party agents) had a legitimate expectation of privacy regarding their highly sensitive and confidential PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

138. Defendants owed a duty to WK Kellogg's current and former employees, including Plaintiff and the Class, to keep this information confidential.

139. The unauthorized acquisition (i.e., theft) by a third party of Plaintiff and Class Members' PII is highly offensive to a reasonable person.

140. The intrusion was into a place or thing which was private and entitled to be private. Plaintiff and the Class (or their third-party agents) disclosed their sensitive and confidential information to Defendants, but did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiff and the Class (or their third-party agents) were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

141. The Data Breach constitutes an intentional interference with Plaintiff's and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

142. Defendants acted with a knowing state of mind when it permitted the Data Breach because it knew their information security practices were inadequate.

143. Defendants acted with a knowing state of mind when it failed to notify Plaintiff and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

144. Acting with knowledge, Defendants had notice and knew that their inadequate cybersecurity practices would cause injury to Plaintiff and the Class.

145. As a proximate result of Defendants' acts and omissions, the private and sensitive PII of Plaintiff and the Class were stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiff and the Class to suffer damages (as detailed *supra*).

146. And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

147. Unless and until enjoined and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their PII are still maintained by Defendants with their inadequate cybersecurity system and policies.

148. Plaintiff and the Class have no adequate remedy at law for the injuries relating to Defendants' continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendants' inability to safeguard the PII of Plaintiff and the Class.

149. In addition to injunctive relief, Plaintiff, on behalf of himself and the other Class Members, also seeks compensatory damages for Defendants' invasion of privacy, which includes the value of the privacy interest invaded by Defendants, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

## FOURTH CAUSE OF ACTION
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

150. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

151. This claim is pleaded in the alternative to the breach of implied contract claim.

152. Plaintiff and Class Members conferred a benefit upon Defendants. After all, Defendant benefitted from (1) using their PII to facilitate employment, and (2) using their labor to derive profit.

153. Defendants appreciated or had knowledge of the benefits it received from Plaintiff and Class Members.

154. Plaintiff and Class Members reasonably understood that Defendants would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendants' duties under state and federal law and their internal policies.

155. Defendants enriched themselves by saving the costs they reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII.

156. Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendants instead calculated to avoid their data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' failure to provide the requisite security.

157. Under principles of equity and good conscience, Defendants should not be permitted to retain the full value of Plaintiff's and Class Members' (1) PII and (2) employment because Defendants failed to adequately protect their PII.

158. Plaintiff and Class Members have no adequate remedy at law.

159. Defendants should be compelled to disgorge into a common fund—for the benefit of Plaintiff and Class Members—all unlawful or inequitable proceeds that it received because of their misconduct.

**FIFTH CAUSE OF ACTION**
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**815 ILCS 505/1, *et seq*.**
**(On Behalf of Plaintiff and the Class)**

160. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

161. This claim is brought under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA").

162. Plaintiff and Class Members are "consumers" as defined in 815 Ill. Comp. Stat. § 505/1(e).

163. Plaintiff, the Class, and Defendants are "persons" as defined in 815 Ill. Comp. Stat. § 505/1(c).

164. The ICFA applies to Defendants because Defendants engaged in "trade" or "commerce," including the provision of services, as defined under 815 Ill. Comp. Stat. § 505/1(f). Defendants engages in the sale of "merchandise" (including services) as defined by 815 Ill. Comp. Stat. § 505/1(b) and (d).

165. Defendants violated ICFA by, *inter alia*:

a. failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's and Class Members' PII, which was a direct and proximate cause of the Data Breach;

b. failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

c. failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' PII, including duties imposed by the FTC Act, 15 U.S.C. § 45, the FCRA, 15 U.S.C. § 1681e, and the GLBA, 15 U.S.C. § 6801, *et seq*., which was a direct and proximate cause of the Data Breach;

d. omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and Class Members' PII; and

e. omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class Members' PII, including duties imposed by

the FTC Act, 15 U.S.C. § 45, the FCRA, 15 U.S.C. § 1681e, and the GLBA, 15 U.S.C. § 6801, *et seq*.

166. Defendants' omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendants' data security and ability to protect the confidentiality of their PII.

167. Defendants intended to mislead Plaintiff and Class Members and induce them to rely on its omissions.

168. Had Defendants disclosed to Plaintiff and Class Members (or their third-party agents) that its data systems were not secure—and thus vulnerable to attack—Defendants would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Defendants accepted the PII that Plaintiff and Class Members entrusted to it while keeping the inadequate state of its security controls secret from the public. Accordingly, Plaintiff and Class Members acted reasonably in relying on Defendants' omissions, the truth of which they could not have discovered through reasonable investigation.

169. Defendants acted intentionally, knowingly, maliciously, and recklessly disregarded Plaintiff's and Class Members' rights.

170. As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiff and Class Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their PII.

171. And, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

172. Plaintiff and Class Members seek all monetary and non-monetary relief allowed by law.

173. Defendants' wrongful practices were and are injurious to the public because those practices were part of Defendants' generalized course of conduct that applied to the Class. Plaintiff and the Class have been adversely affected by Defendants' conduct and the public was and is at risk as a result thereof.

174. Defendants also violated 815 ILCS 505/2 by failing to immediately notify Plaintiff and the Class of the nature and extent of the Data Breach pursuant to the Illinois PII Protection Act, 815 ILCS 530/1, *et seq*.

175. Pursuant to 815 Ill. Comp. Stat. § 505/10a(a), Plaintiff and the Class seek actual and compensatory damages, injunctive relief, and court costs and attorneys' fees as a result of Defendants' violations of the ICFA.

## PRAYER FOR RELIEF

Plaintiff and Class Members respectfully request judgment against Defendants and that the Court enter an order:

A. Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing his counsel to represent the Class;

B. Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiff and the Class;

C. Awarding injunctive relief as necessary to protect the interests of Plaintiff and the Class;

D. Enjoining Defendants from further unfair and/or deceptive practices;

E. Awarding Plaintiff and the Class damages including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

F. Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

G. Awarding attorneys' fees and costs, as allowed by law;

H. Awarding prejudgment and post-judgment interest, as provided by law;

I. Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

J. Granting other relief that this Court finds appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial for all claims so triable.

Dated: April 16, 2025

Respectfully submitted,

By: /s/ *Samuel J. Strauss*

Samuel J. Strauss
Raina C. Borrelli
**STRAUSS BORRELLI PLLC**
One Magnificent Mile
980 N. Michigan Avenue, Suite 1610
Chicago, Illinois 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
sam@straussborrelli.com
raina@straussborrelli.com

*Attorneys for Plaintiff and Proposed Class*